UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| DRUG TRANSPORT, INC., et al., | ) | Jointly Administered Under |
|  | ) | Case No. 14-65621 |
| Debtors. | ) |  |
|  | ) |  |

**EMERGENCY MOTION FOR (1) ORDER AUTHORIZING USE OF CASH COLLATERAL ON AN EMERGENCY BASIS TO AVOID IMMEDIATE AND IRREPARABLE HARM, AND FOR (2) FINAL ORDER AUTHORIZING CASH COLLATERAL USE**

COME NOW Drug Transport, Inc. ("DTI"), DTI Logistics, Inc. ("DTI Logistics"), and DB&D Investments, LLC ("DB&D"), debtors and debtors in possession in the above-styled chapter 11 cases[1] (collectively, the "Debtors"), by and through undersigned counsel, and hereby file their Emergency Motion (the "Motion") for the entry and approval of an order, pursuant to Section 105 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002 and 4001, authorizing the Debtors' use of cash collateral on an emergency basis to operate their businesses in accordance with the proposed budget (the "Budget") attached hereto as Exhibit "A" and the proposed Interim Order (as defined below) attached as Exhibit "B". In support of the Motion, the Debtors show the Court as follows:

**CONCISE STATEMENT OF RELIEF SOUGHT**

**Relief Sought:**   **Authority to use cash collateral on an interim basis and, pending a final hearing, final authority to use cash collateral**

**Entity with Interest**   **Branch Banking and Trust Company (the "Bank")**
**In Cash Collateral:**

---

[1] The Debtors have requested joint administration of their cases. In contemplation of joint administration, the Debtors are filing all first day motions (other than the joint administration motion) in the main case styled above.

**Purposes for the Use
of Cash Collateral:**    **Payment of operational expenses and administrative expenses
in accordance with the Budget attached as Exhibit "A"**

**Duration:**    **Through the date the Court holds a hearing on final approval
(See, Paragraph 28 of the Motion; Paragraph 19 of the
Proposed Order)**

**Adequate Protection:**    **A lien on all personal property of all Debtors, wherever located
and whether created, acquired or arising prior to or after the
Petition Date, including, without limitation, all accounts,
accounts receivable, inventory, equipment, general intangibles,
documents, instruments, chattel paper, deposit accounts and
investment property, together with all proceeds of the
foregoing items, but excluding any equipment subject to prior
perfected and valid security interests in favor of parties other
than the Bank (the "Collateral") (Paragraph 25 of the Motion;
Paragraph 10 of the Proposed Order).**

**Periodic payments to the Bank (i) on Note 17 (as defined
below) in the amount of $50,000, and (ii) rent in the amount of
$12,700 per month relating to the Tucker Terminal (as defined
below) and $1,300 per month relating to the Douglas Terminal
(as defined below), said rent to be paid directly to the Bank.
(Paragraph 25of the Motion; Paragraph 11 of the Proposed
Order).**

**Additional Provisions:**    **(1) Debtors stipulate as to the validity of the debt and the
superpriority claim under 507(b) of the Bankruptcy Code
(Paragraph 12 of the Proposed Order)**

**(2) Weekly reporting requirements of receipts and
disbursements (Paragraph 9 of the Proposed Order)**

**(3) Establishment of Events of Default including (i) the
conversion or dismissal of any of these Chapter 11 Cases;
(ii) the appointment of a trustee or an examiner with expanded
powers in any of these Chapter 11 Cases; (iii) any Debtor's
failure to maintain adequate insurance to the extent as existed
on the Petition Date; (iv) any Debtor's failure duly and
punctually to perform any of its obligations under this Order;
(v) if the Order is amended, vacated, stayed, reversed or
otherwise modified without the prior written consent of the
Bank; (vi) Debtors fail to pay the periodic payments required
as set forth in Paragraph 11 of the Proposed Order; (vii) the**

2

**Court enters an order granting to any person or entity other than the Bank relief from the automatic stay to foreclose upon any lien or security interest with respect to any of the Pre-Petition Collateral; or (viii) without the prior written consent of the Bank, the entry of an order authorizing any Debtor to use any Cash Collateral on terms other than as set forth in this Order or to obtain any financing under Section 364(d) of the Bankruptcy Code secured by a priming lien or lien of equal priority with the Adequate Protection Liens or the Bank's liens upon any of the Pre-Petition Collateral. (Paragraph 14 of the Proposed Order)**

**(4)  No consent to Section 506(c) surcharge (Paragraph 17 of the Proposed Order)**

### Jurisdiction

1.      This Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§157 and 1334.  Venue is proper pursuant to §§1408 and 1409.  This Motion is a core proceeding pursuant to 28 U.S.C. §157(b)(2).  The statutory predicates for the relief requested herein are sections 105(a) and 363 of the Bankruptcy Code and Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure.

### Introduction and Background

1.      On August 11, 2014, (the "Petition Date"), Debtors each filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code.  The Bank asserts a first priority security interest in substantially all assets of the Debtors, except certain financed equipment and vehicles (the "Collateral").

2.      The company now called Drug Transport Inc. ("DTI") was formed in 1981.  In 1982 DTI purchased the Drug Transport business, which had, since 1959, delivered critical shipments to hospitals, nursing homes, and clinics in the South.  After the purchase DTI expanded and grew the business.  DTI branched out beyond service to the healthcare industry

and now provides transportation and logistics services to a wide and diverse range of industries throughout the United States.  As part of DTI's growth, DTI formed DTI Logistics, its truckload services subsidiary, in 1984.  At its peak, DTI and DTI Logistics had over $50 million in aggregate sales.

3.     DTI is 82.5% owned by R.S. Lockwood, Sr. and 17.5% owned by his daughter, Patricia Tafel.

4.     DTI offers dedicated brokerage and truckload transportation service.  The dedicated division provides a fleet and drivers to specific customers.  The brokerage division brokers freight transport through a nationwide network of carriers.   DTI Logistics handles only full truckloads.  DTI was also operating in the "less than truckload" segment of the industry until recently when it sold this operation to Central Freight Lines, Inc. based in Waco, TX.  DB&D owns the real estate – i.e. the terminals where DTI and DTI Logistics base their operations, located in Tucker, Georgia (two facilities on separate parcels) (the "Tucker Terminal"), and in Douglas, Georgia.  DB&D also owns a vacant terminal in Birmingham, Alabama.  In addition to those owned by DB&D, DTI leases terminal facilities in Augusta, Georgia and Greenville, Alabama.

5.     The brokerage division is affiliated with brokers who make arrangements with shippers to have cargo loads transported by licensed motor carriers. DTI acts as intermediary for collection of freight charges from shippers and transmission of payments to the motor carriers. DTI maintains separate accounts for brokerage activities.  Of the Debtors' total receivables as of the Petition Date of approximately $2,759,170, $1,461,133.57 were attributable to DTI's brokerage division as of August 7, 2014.  Of the Debtor's total unsecured claims as of the

Petition Date of $4.8 million, including approximately $524,000 owed to Patricia Tafel, the payables due carriers total $2,778,305.42 as of August 7, 2014.

6.      DB&D, LLC's sole member is R.S. Lockwood, Sr.  DTI Logistics is 100% owned by DTI.

7.      RSL Leasing, LLC ("RSL"), a non-debtor company affiliated with the Debtors, leases tractors and trailers to DTI and DTI Logistics, as set forth in more detail below.  RSL is 50% owned by R.S. Lockwood, Sr. and 50% owned by his son, R.S. Lockwood, Jr.

8.      DTI Logistics leases twelve tractors from Advantage Truck Leasing ("Advantage"), nineteen trucks from Ryder Truck Rental, Inc. d/b/a Ryder Transportation Services ("Ryder"), three trucks on a short term basis from Ryder, and four tractors from RSL. In addition, DTI Logistics has agreements with two owner operators.

9.      DTI leases seventeen trucks from Ryder in connection with DTI's Richmond operations.  Also, DTI leases from RSL: three sixteen-foot trucks, twenty-nine straight (box) trucks, twenty-two tractors, and two hundred twelve (212) fifty-three foot trailers.

10.     The Debtors' lease with RSL provides for monthly payments of $135,000.  For some time, Debtors have made monthly payments in amounts substantially less than $135,000, the majority of which were essentially passed through to RSL's secured creditors, Peoples Bank and United Community Bank ("UCB").[2]  RSL is current with UCB and with Peoples Bank. Debtors' proposed cash collateral order provides authority for Debtors to continue to make payments to RSL in such amounts as are necessary to keep RSL's obligations to UCB and Peoples Bank current, and specifically prohibits any other payments to RSL.

---

[2] At such time as Debtors file their schedules as required by Rule 1007 Debtors will identify all payments made to RSL within the year prior to the Petition Date and the amounts indirectly received by insiders from RSL.

11.     Included in the expense budgeted for RSL is a payment of $740.00 per month to Nissan Finance for the purchase of a vehicle used by Debtor's principal, Richard Lockwood, Sr. Debtors are not seeking authority to pay RSL this passed through expense to Nissan at this time, but reserve the right to seek such authority when this motion comes before the Court for final hearing.

12.     Debtors' primary secured creditor, Branch Banking and Trust Company ("BB&T") has filed a complaint against the Debtors on August 1, 2014 in the United States District Court for the Northern District of Georgia, seeking the appointment of a receiver and recovery of the principal amount of $7,053,443.31, plus pre-judgment interest, post-judgment interest, attorneys' fees and other damages.

13.     On August 5, 2014, Debtors and BB&T presented a consent order (the "Receivership Order") to United States District Judge Clarence Cooper.  The Receivership Order provided that the Debtors would be enjoined from making any payments without BB&T's consent except for certain scheduled payments and payments authorized under a budget attached to the Receivership Order.  The Receivership Order further provided that no receiver would be appointed prior to August 12, 2014, on which date an order appointing a receiver could be entered without further notice or hearing.  The Receivership Order was entered on August 8, 2014.  Pursuant to the Receivership Order, Debtors paid the Bank $50,000 on August 8, 2014.

14.     Prior to the filing of the petitions, on August 8, 2014, Debtors sold the LTL division of DTI's business to Central Freight Lines, Inc., a Texas corporation ("Central").  The assets sold consisted of the customer list of the Debtors' LTL division. The purchase consideration consisted of (i) a 2% Revenue Earn-Out for 36 months (payable quarterly on revenue booked and received by Central, less fuel surcharge); (ii) an Employee Earn-Out of $500

per employee for each year that a former employee of Debtors continues to be employed by Central; and (iii) four year term leases for DB&D's terminals in Tucker and Douglas, Georgia with an aggregate rental amount of $14,000 per month.  At closing, Central made a $350,000 non-refundable advance payment against the earn-outs, which payment, pursuant to the Receivership Order, was remitted to BB&T, and Central executed leases for the Tucker and Douglas terminals. Absent immediate sale the Debtors would have had no choice but to immediately terminate all LTL employees and would have received no benefit from the goodwill of the business.

15.    Due to the Debtors' financial condition, carriers are no longer able to factor DTI's receivables.  This has essentially shut down DTI's brokerage division, leaving DTI's brokerage division with approximately 64 loads in transit with outside carriers as of August 8, 2014. Debtors will reorganize around DTI's dedicated division and DTI Logistics' truckload division, which have historically been profitable.

16.    Prior to the Petition Date, Debtor retained Triton Capital Partners, Ltd. as a financial advisor[3].

17.    On August 4, 2014, Debtors executed an engagement agreement for Triton to provide the services of Triton's Managing Director, Bayard B. Hollingsworth, as Chief Restructuring Officer for the Debtors with financial control of the Debtors' cash, and with authority to collect all receivables of the Debtors and to pay such sums to employees, suppliers and creditors as he deems necessary to maintain the Debtors' business operations and assets.  Mr. Hollingsworth will act as the responsible person for the debtors-in-possession in these cases.

18.    Immediately prior to filing, Debtor's cash position consisted of deposits at BB&T in the approximate amount of $486,000 and at SunTrust in the approximate amount of $40,000.

---

[3] Prior to May 18, 2014, Triton served as a consultant rather than a financial advisor.

19.     The Bank asserts that Debtors are indebted to the Bank pursuant to the following:

a)     That certain Promissory Note dated July 22, 2005 in the original principal amount of $810,000 executed by Debtor DB&D in favor of the Bank ("Note 1") with an approximate principal amount of indebtedness, exclusive of accrued interest, fees, costs, expenses, attorneys' fees and other charges, as of July 31, 2014, of $566,285.38.

b)     That certain Promissory Note dated July 22, 2005 in the original principal amount of $320,000 executed by Debtor DB&D in favor of the Bank ("Note 2") with an approximate principal amount of indebtedness, exclusive of accrued interest, fees, costs, expenses, attorneys' fees and other charges, as of July 31, 2014, of $223,719.63.

c)     That certain Promissory Note dated July 22, 2005 in the original principal amount of $1,252,000 executed by Debtor DB&D in favor of the Bank ("Note 9") with an approximate principal amount of indebtedness, exclusive of accrued interest, fees, costs, expenses, attorneys' fees and other charges, as of July 31, 2014, of $942,326.00.

d)     That certain Promissory Note dated July 22, 2005 in the original principal amount of $148,000.00 executed by Debtor DB&D in favor of the Bank ("Note 10") with an approximate principal amount of indebtedness, exclusive of accrued interest, fees, costs, expenses, attorneys' fees and other charges, as of July 31, 2014, of $111,392.19.

e)     That certain Promissory Note dated June 28, 2006 in the original principal amount of $900,000 executed by Debtor DB&D in favor of the Bank ("Note 11") with an approximate principal amount of indebtedness, exclusive of accrued interest, fees, costs, expenses, attorneys' fees and other charges, as of July 31, 2014, of $766,681.33.

f)     That certain Promissory Note dated October 20, 2011 in the original principal amount of $4,200,000 executed by Debtor Drug Transport in favor of the Bank

("Note 17") with an approximate principal amount of indebtedness, exclusive of accrued interest, fees, costs, expenses, attorneys' fees and other charges, as of July 31, 2014, of $4,027,745.17.

g)       That certain Promissory Note dated July 18, 2012 in the original principal amount of $719,882.14 executed by Debtors Drug Transport, DB&D, and DTI, jointly and severally. in favor of the Bank ("Note 18") with an approximate principal amount of indebtedness, exclusive of accrued interest, fees, costs, expenses, attorneys' fees and other charges, as of July 31, 2014, of $415,293.61.

20.    The Bank asserts that the indebtedness is secured by the following:

a)       certain real property and improvements located at 2600 Republic Boulevard, Birmingham, Jefferson County, Alabama (the "Alabama Real Estate"), pursuant to a Mortgage of Real Estate and Security Agreement executed by DB&D in favor of BB&T dated July 22, 2005, recorded on March 31, 2006, at Deed Book LR200606, Page 4144 (the "Note 1 Security Deed"), and Mortgage of Real Estate and Security Agreement executed by DB&D in favor of BB&T dated July 22, 2005, recorded on March 31, 2006, at Deed Book LR200606, Page 4156, (the "Note 2 Security Deed") in the real estate records of Jefferson County, Alabama.

b)       certain real property and improvements located at 4732 Stone Drive, Tucker, DeKalb County, Georgia (the "Stone Drive Real Estate"), pursuant to a Deed to Secure Debt, Assignment of Rents and Security Agreement executed by DB&D in favor of BB&T dated June 28, 2006 (the "Note 11 Security Deed"), recorded on July 14, 2006, at Deed Book 18926, Page 370, in the real estate records of DeKalb County, Georgia.

c)      certain real property and improvements located at 1939 Forge Street, Tucker, DeKalb County, Georgia (the "Forge Street Real Estate"), pursuant to a Georgia Security Deed and Security Agreement executed by DB&D in favor of BB&T dated June 28, 2006, recorded on July 12, 2006, at Deed Book 18918, Page 779, DeKalb County Records (the "Note 9 Security Deed"), in the real estate records of DeKalb County, Georgia.

d)      substantially all of Drug Transport's personal property assets (collectively, the "Drug Transport Personal Property"), including, without limitation, equipment, accounts, general intangibles, supporting obligations, and the proceeds thereof, pursuant to BB&T Security Agreements executed by Drug Transport in favor of BB&T dated June 28, 2006 and October 20, 2011, respectively (collectively, the "Drug Transport Security Agreements").

e)      Certain real property and improvements located at 1519 Perrin Drive, Douglas, Coffee County, Georgia (the "Coffee County Real Estate"), pursuant to a Georgia Security Deed and Security Agreement executed by DB&D in favor of BB&T dated June 28, 2006 (as at any time amended or modified, the "Note 10 Security Deed"; together with the Note 1 Security Deed, Note 2 Security Deed, Note 9 Security Deed and Note 11 Security Deed, the "Security Deeds"), recorded on July 13, 2006, at Deed Book 1271, Page 25, in the real estate records of Coffee County, Georgia (the "Coffee County Records") UCC-1 Financing Statement No. 033-200605663 on August 9, 2006 (the "2006 Financing Statement"), as continued by UCC-1 Financing Statement Amendment No. 033-2011-03931 (the "Continuation Statement"), and that certain UCC-1 Financing Statement No. 044-2012-002324 on July 18, 2012 (the "2012 Financing Statement").

f)      Cross-Default and Cross-Collateral Agreement dated July 18, 2012.

g)      Security Agreement in favor of BB&T dated July 18, 2012 (the "DTI Security Agreement"), pursuant to which DTI pledged all or substantially all of its personal property assets (collectively, the "DTI Personal Property"), including, without limitation, accounts, general intangibles, supporting obligations, and the proceeds thereof.

h)      Guaranty Agreement dated October 21, 2013 (the "DB&D Guaranty"), pursuant to which DB&D guaranteed the full and timely payment and performance of all Obligations owed by Drug Transport to BB&T.

i)      Guaranty Agreement dated June 21, 2013 (the "Drug Transport Guaranty"), pursuant to which Drug Transport guaranteed the full and timely payment and performance of all obligations owed by DB&D to BB&T.

j)      Guaranty Agreement dated June 21, 2013 (the "DTI Guaranty"), pursuant to which DTI guaranteed the full and timely payment and performance of all obligations owed by DB&D to BB&T. (collectively, the "Guaranties"), each Defendant has directly or indirectly guaranteed the payment and performance of all of the Obligations.

21.     Additionally, the Bank asserts that Debtors are indebted to the Bank for charges incurred by Drug Transport pursuant to a Commercial Credit Card Agreement (the "Purchasing Card") (balance as of July 16, 2014 - $47,506.61).

## **RELIEF REQUESTED**

22.     Bankruptcy Code Section 363(c)(2) provides that a debtor in possession may not use cash collateral unless an entity that has an interest in such cash collateral consents or the Court approves the use, conditioned on provision of adequate protection. Section 363(o) provides that at a hearing on the use of cash collateral, the entity asserting an interest in the cash collateral

has the burden of proof on the issue of the validity, priority, or extent of such interest, and the debtor in possession has the burden of proof on the issue of adequate protection. Rule 4001(b)(2) provides that the Court may not hold a final hearing on a motion to use cash collateral earlier than 14 days after service of the motion, but may authorize the use of cash collateral prior to a final hearing as necessary to avoid immediate and irreparable harm to the estate pending a final hearing.

23.     The Debtors request authority to use cash collateral for the purpose of avoiding immediate and irreparable harm to the estates. The authority to continue using cash collateral should continue until the Court rules on the Debtors' request following a final hearing.

24.     The Debtors recognize that the Bank is entitled to adequate protection of its secured interest in the Collateral and the cash collateral within the meaning of 11 U.S.C. §§ 361 and 363.  The Debtors acknowledge that, in consideration of the Debtors' use of the Bank's Collateral and cash collateral, the Bank is entitled to adequate protection of its security interest in and lien on the Collateral and cash collateral.

25.     The Debtors have agreed to provide such adequate protection pursuant to the terms hereof in the form of a post-petition replacement lien, as follows:  In connection with the Debtors' use of cash collateral during the Interim Period and to provide the Bank adequate protection in respect of the Debtors' use of such cash collateral as well as for any decrease in the value of its interests in the Collateral during the Interim Period, the Debtors agree, subject to approval of this Court, to grant the Bank *nunc pro tunc* as of the commencement of the Chapter 11 case, a first priority lien pursuant to 11 U.S.C. §361(2) on and in all of the Debtors' property (excluding any equipment subject to perfected and valid security interests in favor of a party

other than the Bank) to the same extent and priority and of the same kind and nature as the Collateral and cash collateral.

26.     As additional adequate protection, the Debtors propose to pay $108,000 over the first thirteen weeks of cash collateral use, as scheduled in the Budget.  Additionally, Debtors shall pay rent to the Bank in the amount of $1,300 per month relating to the Douglas Terminal and $12,700 per month relating to the Tucker Terminal applied against the applicable real estate note.

27.     Cash collateral shall be used strictly in accordance with the terms of the Budget. Notwithstanding anything herein to the contrary, the Debtors propose that the liens and administrative claims granted to the Bank hereunder in connection with the use of Collateral and cash collateral be subject and junior to the fees of the Office of the United States Trustee pursuant to 28 U.S.C. §1930. The security interests and liens granted to the Bank in connection with the use of the cash collateral will be valid and perfected without the need for the execution or filing of any further documents or instruments.

**Final Authority for Use of Cash Collateral**

28.     The Debtors further request that the Court schedule a final hearing on cash collateral use and, following such hearing, enter a final order authorizing cash collateral use. At such hearing, the Court will consider any additional adequate protection requested by the Bank or agreed upon by the Debtors.

**Basis for Relief**

**The Court Should Approve the Motion Because
the Lender has been Provided Adequate Protection**

29.     The Debtors have agreed to provide adequate protection as contemplated by Section 363(c)(2) of the Bankruptcy Code and hereby seek the Court's approval therefor. The

Bankruptcy Code does not explicitly define "adequate protection," but does provide a non-exclusive list of the means by which a debtor may provide adequate protection, including "other relief" resulting in the "indubitable equivalent" of the secured creditor's interest in such property.   11 U.S.C. § 361. What constitutes adequate protection must be evaluated on a case-by-case basis. *In re Swedeland Dev. Group Inc.,* 16 F.3d 552, 564 (3rd Cir. 1994) (*citing In re O'Connor*, 808 F.2d 1393, 1396-97 (10th Cir. l987)); *In re Martin*, 761 F.2d 472, 476 (8th Cir. 1985).   Adequate protection is meant to ensure that the secured lender receives the value for which it originally bargained. *Swedeland*, 16 F.3d at 564 (*citing O'Connor*, 808 F.2d at 1396) ("the whole purpose of adequate protection for a creditor is to ensure that the creditor receives the value for which he bargained pre bankruptcy").   Courts have noted that "the essence of adequate protection is the assurance of the maintenance and continued recoverability of the lien value during the interim between the filing . . . and the confirmation." *In re Arriens*, 25 B.R. 79, 81 (Bankr. D.Or. 1982).   The focus of the requirement is to protect a secured creditor from diminution in value during the use period. *See In re Kain*, 86 B.R 506, 513 (Bankr. W.D. Mich.1988); *In re Becker Indus. Corp.,* 58 B.R. 725, 736 (Bankr. S.D.N.Y. 1986); *In re Ledgmere Land Corp.*, 116 B.R. 338, 343 (Bankr. D. Mass. 1990).

30.     The Debtors' requested use of cash collateral as set forth in the Budget and the protections proposed to be afforded to the Bank in the Proposed Order, in light of the circumstances, are reasonable, appropriate, and sufficient to satisfy the legal standard of "adequate protection" and will serve to maintain the value of the Bank's Collateral.

### The Use of Cash Collateral Will Preserve the Debtors' Assets and Going Concern Value

31.     The continuation of the Debtors' operations will preserve their going-concern value. If the Debtors are not allowed to use cash collateral, their businesses will likely shut

down. Additionally, the Debtors have property at numerous locations and outstanding receivables. The Debtors require the use of cash collateral to protect and preserve the value of their property and facilitate the collection of receivables.

32.     It is well established that a bankruptcy court, where possible, should resolve issues in favor of preserving the business of the debtor as a going concern:

> A debtor, attempting to reorganize a business under Chapter 11, clearly has a compelling need to use "cash collateral" in its effort to rebuild. Without the availability of cash to meet daily operating expenses such as rent, payroll, utilities, etc., the congressional policy favoring rehabilitation over economic failure would be frustrated.

*In re George Ruggiere Chrysler-Plymouth, Inc.,* 727 F.2d 1017, 1019 (11th Cir. 1984).

33.     As discussed above, the Debtors will use cash collateral during the interim period in the ordinary course of their businesses.  If the Debtors cannot use cash collateral during the interim period, they likely will be forced to cease operations and convert their cases to Chapter 7. This business cessation would irreparably damage the value of the Debtors' assets. In contrast, granting authority will permit the Debtors to maintain operations and preserve going concern value.

**The Lender is Adequately Protected by the Grant
of Replacement Liens and Periodic Payments**

34.     The Bankruptcy Code expressly provides that "granting a replacement lien is a means of adequate protection". 11 U.S.C. § 361(2).  Granting replacement liens provides ample adequate protection of the secured creditor's interest in cash collateral.  *See e.g. In re O'Connor*, 808 F.2d at 1393; *In re Dixie-Shamrock Oil & Gas. Inc.*, 39 B.R. 115, 118 (Bankr. M.D. Tenn. 1984).  The Debtors will adequately protect the Bank's interests in cash collateral by providing liens on the Debtors' personal property (including post-petition personal property, but excluding any equipment subject to perfected and valid security interests in favor of a party other than the

Bank) to the extent the Debtors' use of cash collateral results in a postpetition decrease in the value securing the Bank's claims.

35.     The Bankruptcy Court also expressly provides that periodic cash payments constitute adequate protection. 11 U.S.C. § 361(1). The payments are intended to protect the affected entity against a decrease in the value of its collateral, which would directly affect the entity's interest in the collateral. *See, Traveler Ins. Co. v. American AgCredit Corp.* (*In re Blehm Land & Cattle Co.*), 859 F.2d 137 (10th Cir. 1988). Here, the Debtor's proposed payments on Note 17, as well as rental payments totaling $14,000 directly to the Bank on the Douglas Terminal and the Tucker Terminal.

36.     The Debtors believe that use of cash collateral (a) during the interim period to avoid irreparable harm pursuant to the terms and conditions set forth above, and (b) on a final basis following a final hearing on cash collateral use, is fair, reasonable, and necessary. The combination of (i) the Debtors' ability to preserve the going concern value and the preservation of assets through the use of cash collateral, (ii) the post-petition liens granted to the Bank, and (iii) the monthly payments to the Bank, adequately protects the Bank's secured position under Section 361.  For all of the reasons stated above, the Motion should be granted.

**WHEREFORE**, the Debtors respectfully request that the Court enter an order (A) authorizing the Debtors (i) to use the collateral and cash collateral pursuant to the terms set forth above and in accordance with the Budget, (ii) to grant the liens set forth above in connection with the use of the collateral and cash collateral, and (B) setting a final hearing hereon at least fourteen (14) days after the entry of an interim order on this Motion, and for such other and further relief as the Court deems just and proper.

Respectfully submitted this 11th day of August, 2014.

LAMBERTH, CIFELLI, STOKES, ELLIS
   & NASON, P.A.
Proposed Attorneys for Debtors

 /s/ Gregory D. Ellis
James C. Cifelli
Georgia Bar No. 125750
jcifelli@lcsenlaw.com
Gregory D. Ellis
Georgia Bar No. 245310
gellis@lcsenlaw.com
William D. Matthews
Georgia Bar No. 470865
wmatthews@lcsenlaw.com

3343 Peachtree Road, N.E.
Ste. 550
Atlanta, GA  30326
(404) 262-7373
(404) 262-9911 (facsimile)

**EXHIBIT "A" FOLLOWS**

PRIVILEGED AND CONFIDENTIAL

DRAFT - SUBJECT TO MATERIAL CHANGE

## 13-Week Cash Budget

| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Beginning | 11-Aug | 18-Aug | 25-Aug | 1-Sep | 8-Sep | 15-Sep | 22-Sep | 29-Sep | 6-Oct | 13-Oct | 20-Oct | 27-Oct | 3-Nov | TOTAL |
| **Sales** | 270,000 | 270,000 | 270,000 | 270,000 | 270,000 | 270,000 | 270,000 | 270,000 | 280,000 | 280,000 | 280,000 | 280,000 | 280,000 | 3,560,000 |
| **Cash Receipts** | | | | | | | | | | | | | | |
| Rental Income | 0 | 17,161 | 0 | 68,000 | 0 | 0 | 14,000 | 12,000 | 30,000 | 0 | 14,000 | 12,000 | 10,000 | 177,161 |
| Pre-Petition Receipts | 450,000 | 400,000 | 350,000 | 250,000 | 100,000 | 50,000 | 25,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 1,715,000 |
| Post-Petition Receipts | 0 | 0 | 0 | 270,000 | 270,000 | 270,000 | 270,000 | 270,000 | 270,000 | 270,000 | 270,000 | 280,000 | 280,000 | 2,720,000 |
| **Total Cash Receipts** | 450,000 | 417,161 | 350,000 | 588,000 | 370,000 | 320,000 | 309,000 | 297,000 | 315,000 | 285,000 | 299,000 | 307,000 | 305,000 | 4,612,161 |
| **Operating Disbursements** | | | | | | | | | | | | | | |
| Payroll & Payroll Tax | 211,300 | 34,000 | 136,300 | 34,000 | 118,000 | 34,000 | 118,000 | 34,000 | 118,000 | 35,000 | 118,000 | 35,000 | 118,000 | 1,143,600 |
| Broker Commission | 10,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 10,000 |
| Owner/Operators (Independent Contractors) | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 104,000 |
| Benefits | 3,600 | 0 | 41,600 | 0 | 0 | 0 | 30,400 | 0 | 0 | 0 | 30,500 | 0 | 0 | 106,100 |
| Temporary Labor | 11,000 | 11,000 | 11,000 | 11,000 | 11,000 | 11,000 | 11,000 | 11,000 | 11,000 | 11,000 | 11,000 | 11,000 | 11,000 | 143,000 |
| Fuel | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 80,000 | 1,040,000 |
| Equipment Leases - Long Term | 0 | 0 | 0 | 125,000 | 0 | 0 | 0 | 0 | 125,000 | 0 | 0 | 0 | 0 | 250,000 |
| Equipment Leases - Short Term | 0 | 0 | 0 | 5,000 | 0 | 0 | 0 | 0 | 5,000 | 0 | 0 | 0 | 0 | 10,000 |
| Equipment Leases - RSL Leasing | 10,945 | 5,256 | 30,346 | 0 | 34,571 | 10,945 | 5,256 | 30,346 | 0 | 34,571 | 10,945 | 5,256 | 30,346 | 208,783 |
| Truck Repair & Towing | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 104,000 |
| Tires | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 32,500 |
| Insurance | 5,933 | 17,500 | 16,659 | 8,000 | 8,000 | 8,000 | 8,000 | 40,000 | 8,000 | 8,000 | 8,000 | 8,000 | 8,000 | 152,092 |
| Lease/Rent Expense - Facilities | 0 | 0 | 0 | 1,575 | 0 | 0 | 0 | 1,575 | 0 | 0 | 0 | 1,575 | 0 | 4,725 |
| Property Maintenance | 0 | 0 | 0 | 500 | 0 | 0 | 0 | 500 | 0 | 0 | 0 | 500 | 0 | 1,500 |
| Utilities & Utilities Deposit | 0 | 10,000 | 0 | 5,000 | 0 | 0 | 0 | 5,000 | 0 | 0 | 0 | 5,000 | 0 | 25,000 |
| Office Expenses | 1,500 | 1,500 | 1,500 | 1,500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 500 | 10,500 |
| Computer and Records Retention | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 32,500 |
| Payments for Pre-Petition Invoices | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 39,000 |
| Miscellaneous | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 3,000 | 39,000 |
| **Total Operating Disbursements** | 361,278 | 186,256 | 344,405 | 298,575 | 279,071 | 171,445 | 280,156 | 229,921 | 374,500 | 196,071 | 285,945 | 173,831 | 274,846 | 3,456,300 |
| **Non Operating Disbursements** | | | | | | | | | | | | | | |
| Professional Fees - Legal (Company) | 0 | 0 | 0 | 0 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 22,000 | 198,000 |
| Professional Fees - Legal (Committee) | 0 | 0 | 0 | 0 | 25,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 25,000 |
| Professional Fees - Accounting & Tax | 0 | 0 | 0 | 0 | 11,450 | 0 | 10,000 | 0 | 0 | 10,000 | 0 | 0 | 0 | 31,450 |
| Professional Fees - CRO | 15,000 | 15,000 | 15,000 | 12,500 | 12,500 | 12,500 | 12,500 | 11,250 | 11,250 | 11,250 | 11,250 | 10,000 | 10,000 | 160,000 |
| US Trustee | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 13,000 | 0 | 13,000 |
| Payments to BB&T | 0 | 14,000 | 0 | 0 | 36,000 | 0 | 14,000 | 0 | 36,000 | 0 | 14,000 | 0 | 36,000 | 150,000 |
| **Total Non Operating Disbursements** | 15,000 | 29,000 | 15,000 | 12,500 | 106,950 | 34,500 | 58,500 | 33,250 | 69,250 | 43,250 | 47,250 | 45,000 | 68,000 | 577,450 |
| **Total Disbursements** | 376,278 | 215,256 | 359,405 | 311,075 | 386,021 | 205,945 | 338,656 | 263,171 | 443,750 | 239,321 | 333,195 | 218,831 | 342,846 | 4,033,750 |
| **Net Operating Cash Activitiy** | 73,722 | 201,906 | (9,405) | 276,925 | (16,021) | 114,055 | (29,656) | 33,829 | (128,750) | 45,679 | (34,195) | 88,169 | (37,846) | 578,412 |
| **Net Cash Flow (Cumulative)** | 121,331 | 323,236 | 313,831 | 590,756 | 574,735 | 688,790 | 659,134 | 692,964 | 564,214 | 609,893 | 575,697 | 663,867 | 626,021 | 626,021 |

PRIVILEGED AND CONFIDENTIAL

DRAFT - SUBJECT TO MATERIAL CHANGE

## 13-Week Cash Budget

| | Week 1 | Week 2 | Week 3 | Week 4 | Week 5 | Week 6 | Week 7 | Week 8 | Week 9 | Week 10 | Week 11 | Week 12 | Week 13 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Week Beginning | 11-Aug | 18-Aug | 25-Aug | 1-Sep | 8-Sep | 15-Sep | 22-Sep | 29-Sep | 6-Oct | 13-Oct | 20-Oct | 27-Oct | 3-Nov | TOTAL |
| **Operating Cash:** | | | | | | | | | | | | | | |
| Beginning | 509,430 | 583,152 | 785,057 | 775,652 | 1,052,577 | 1,036,556 | 1,150,611 | 1,120,955 | 1,154,785 | 1,026,035 | 1,071,714 | 1,037,518 | 1,125,688 | 509,430 |
| Cash Payments | (376,278) | (201,256) | (359,405) | (311,075) | (350,021) | (205,945) | (324,656) | (263,171) | (407,750) | (239,321) | (319,195) | (218,831) | (306,846) | (3,883,750) |
| BB&T Adequate Protection Payment | 0 | (14,000) | 0 | 0 | (36,000) | 0 | (14,000) | 0 | (36,000) | 0 | (14,000) | 0 | (36,000) | (150,000) |
| Cash Received | 450,000 | 417,161 | 350,000 | 588,000 | 370,000 | 320,000 | 309,000 | 297,000 | 315,000 | 285,000 | 299,000 | 307,000 | 305,000 | 4,612,161 |
| **Ending Cash Balance** | **583,152** | **785,057** | **775,652** | **1,052,577** | **1,036,556** | **1,150,611** | **1,120,955** | **1,154,785** | **1,026,035** | **1,071,714** | **1,037,518** | **1,125,688** | **1,087,842** | **1,087,842** |
| | | | | | | | | | | | | | | |
| **Revolver Balance:** | | | | | | | | | | | | | | |
| Beginning | 3,643,000 | 3,643,000 | 3,643,000 | 3,643,000 | 3,643,000 | 3,607,000 | 3,607,000 | 3,607,000 | 3,607,000 | 3,571,000 | 3,571,000 | 3,571,000 | 3,571,000 | 3,643,000 |
| Repayment | 0 | 0 | 0 | 0 | (36,000) | 0 | 0 | 0 | (36,000) | 0 | 0 | 0 | (36,000) | (108,000) |
| **Ending Revolver Balance** | **3,643,000** | **3,643,000** | **3,643,000** | **3,643,000** | **3,607,000** | **3,607,000** | **3,607,000** | **3,607,000** | **3,571,000** | **3,571,000** | **3,571,000** | **3,571,000** | **3,535,000** | **3,535,000** |
| | | | | | | | | | | | | | | |
| **Revolver Net of Cash On Hand** | **3,059,848** | **2,857,943** | **2,867,348** | **2,590,423** | **2,570,444** | **2,456,389** | **2,486,045** | **2,452,215** | **2,544,965** | **2,499,286** | **2,533,482** | **2,445,312** | **2,447,158** | **2,447,158** |
| | | | | | | | | | | | | | | |
| **Accounts Receivable** | | | | | | | | | | | | | | |
| Beginning | 2,759,170 | 2,579,170 | 2,449,170 | 2,369,170 | 2,119,170 | 2,019,170 | 1,969,170 | 1,944,170 | 1,929,170 | 1,924,170 | 1,919,170 | 1,914,170 | 1,899,170 | 2,759,170 |
| Sales | 270,000 | 270,000 | 270,000 | 270,000 | 270,000 | 270,000 | 270,000 | 270,000 | 280,000 | 280,000 | 280,000 | 280,000 | 280,000 | 3,560,000 |
| Collections | (450,000) | (400,000) | (350,000) | (520,000) | (370,000) | (320,000) | (295,000) | (285,000) | (285,000) | (285,000) | (285,000) | (295,000) | (295,000) | (4,435,000) |
| Ending Accounts Receivable Balance | 2,579,170 | 2,449,170 | 2,369,170 | 2,119,170 | 2,019,170 | 1,969,170 | 1,944,170 | 1,929,170 | 1,924,170 | 1,919,170 | 1,914,170 | 1,899,170 | 1,884,170 | 1,884,170 |
| Advance Rate | 85.0% | 85.0% | 85.0% | 85.0% | 85.0% | 85.0% | 85.0% | 85.0% | 85.0% | 85.0% | 85.0% | 85.0% | 85.0% | 85.0% |
| **Total Availability** | **2,192,295** | **2,081,795** | **2,013,795** | **1,801,295** | **1,716,295** | **1,673,795** | **1,652,545** | **1,639,795** | **1,635,545** | **1,631,295** | **1,627,045** | **1,614,295** | **1,601,545** | **1,601,545** |
| | | | | | | | | | | | | | | |
| **Excess Availability/ (Over-Advance)** | (867,553) | (776,148) | (853,553) | (789,128) | (854,149) | (782,594) | (833,500) | (812,421) | (909,421) | (867,992) | (906,437) | (831,018) | (845,614) | (845,614) |
| **Cumulative Change** | **0** | **91,406** | **14,001** | **78,426** | **13,405** | **84,959** | **34,054** | **55,133** | **(41,867)** | **(438)** | **(38,884)** | **36,536** | **21,940** | **21,940** |

**EXHIBIT "B" FOLLOWS**

UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 11 |
|  | ) |  |
| DRUG TRANSPORT, INC., et al. | ) | Jointly Administered Under |
|  | ) | Case No. 14- |
| Debtors. | ) |  |
|  | ) |  |

**INTERIM ORDER AUTHORIZING LIMITED USE
OF CASH COLLATERAL BY DEBTORS IN POSSESSION AND PROVIDING
ADEQUATE PROTECTION TO BRANCH BANKING AND TRUST COMPANY**

This matter came on for a hearing before the Court on August _____, 2014 (the "Preliminary Hearing"), on the "Emergency Motion of Debtors for (1) Order Authorizing Use of Cash Collateral on an Emergency Basis to Avoid Immediate and Irreparable Harm, and (2) Final Order Authorizing Cash Collateral Use" filed by Drug Transport, Inc., debtor and debtor in possession ("Drug Transport") and the affiliated debtors, DTI Logistics, Inc. ("DTI Logistics") and DB&D Investments, LLC ("DB&D") (with Drug Transport, each Debtor identified is referred to as a "Debtor," and collectively, as the "Debtors"), pursuant to Section 363 of the Bankruptcy Code and Bankruptcy Rule 4001(b) (the "Cash Collateral Motion") to use certain cash that is subject to security interests and liens in favor of Branch Banking and Trust Company (the "Bank"), and therefore constitutes cash collateral within the meaning of Section 363 of the Bankruptcy Code.

1

A.     On August 11, 2014 (the "Petition Date"), Debtors filed with this Court their respective petitions for relief under Chapter 11 of the Bankruptcy Code commencing these chapter 11 cases (the "Chapter 11 Cases"). Pursuant to Sections 1107 and 1108 of the Bankruptcy Code, Debtors have retained possession of their assets and are authorized to continue the operation and management of their businesses as debtors in possession.

B.     The Bank asserts that Debtors are indebted to the Bank pursuant to the following documents, among others:

1)     That certain Promissory Note dated July 22, 2005 in the original principal amount of $810,000 executed by Debtor DB&D in favor of the Bank ("Note 1") with an approximate principal amount of indebtedness, exclusive of accrued interest, fees, costs, expenses, attorneys' fees and other charges, as of  July 31, 2014, of $566,285.38.

2)     That certain Promissory Note dated July 22, 2005 in the original principal amount of $320,000 executed by Debtor DB&D in favor of the Bank ("Note 2") with an approximate principal amount of indebtedness, exclusive of accrued interest, fees, costs, expenses, attorneys' fees and other charges, as of  July 31, 2014, $223,719.63.

3)     That certain Promissory Note dated July 22, 2005 in the original principal amount of $1,252,000 executed by Debtor DB&D in favor of the Bank ("Note 9") with an approximate principal amount of indebtedness, exclusive of accrued interest, fees, costs, expenses, attorneys' fees and other charges, as of  July 31, 2014, of $942,326.00.

4)     That certain Promissory Note dated July 22, 2005 in the original principal amount of $148,000.00 executed by Debtor DB&D in favor of the Bank ("Note 10") with an approximate principal amount of indebtedness, exclusive of accrued interest, fees, costs, expenses, attorneys' fees and other charges, as of  July 31, 2014, of $111,392.19.

5)     That certain Promissory Note dated June 28, 2006 in the original principal amount of $900,000 executed by Debtor DB&D in favor of the Bank ("Note 11") with an approximate principal amount of indebtedness, exclusive of accrued interest, fees, costs, expenses, attorneys' fees and other charges, as of  July 31, 2014, of $766,681.33.

6)     That certain Promissory Note dated October 20, 2011 in the original principal amount of $4,200,000 executed by Debtor Drug Transport in favor of the Bank ("Note 17") with an approximate principal amount of indebtedness, exclusive of accrued interest, fees, costs, expenses, attorneys' fees and other charges, as of  July 31, 2014, of $4,027,745.17.

7)     That certain Promissory Note dated July 18, 2012 in the original principal amount of $719,882.14 executed by Debtors Drug Transport, DB&D, and DTI, jointly and severally, in favor of the Bank ("Note 18") with an approximate principal amount of indebtedness, exclusive of accrued interest, fees, costs, expenses, attorneys' fees and other charges, as of  July 31, 2014, of $415,293.61.

441331

8)      Certain real property and improvements located at 2600 Republic Boulevard, Birmingham, Jefferson County, Alabama (the "Alabama Real Estate"), and the rents and profits therefrom, pursuant to, among other documents, a Mortgage of Real Estate and Security Agreement executed by DB&D in favor of Bank dated July 22, 2005, recorded on March 31, 2006, at Deed Book LR200606, Page 4144 (the "Note 1 Security Deed"), and Mortgage of Real Estate and Security Agreement executed by DB&D in favor of Bank dated July 22, 2005, recorded on March 31, 2006, at Deed Book LR200606, Page 4156, (the "Note 2 Security Deed") in the real estate records of Jefferson County, Alabama.

9)      Certain real property and improvements located at 4732 Stone Drive, Tucker, DeKalb County, Georgia (the "Stone Drive Real Estate"), and the rents and profits therefrom, pursuant to, among other documents, a Deed to Secure Debt, Assignment of Rents and Security Agreement executed by DB&D in favor of Bank dated June 28, 2006 (the "Note 11 Security Deed"), recorded on July 14, 2006, at Deed Book 18926, Page 370, in the real estate records of DeKalb County, Georgia.

10)      Certain real property and improvements located at 1939 Forge Street, Tucker, DeKalb County, Georgia (the "Forge Street Real Estate"), and the rents and profits therefrom, pursuant to, among other documents, a Georgia Security Deed and Security Agreement executed by DB&D in favor of Bank dated June 28, 2006, recorded on July 12, 2006, at Deed Book 18918, Page 779, DeKalb County Records (the "Note 9 Security Deed"), in the real estate records of DeKalb County, Georgia.

11)      Substantially all of Drug Transport's personal property assets (collectively, the "Drug Transport Personal Property"), including, without limitation, equipment, accounts, general intangibles, supporting obligations, and the proceeds thereof, pursuant to Bank Security Agreements executed by Drug Transport in favor of Bank dated June 28, 2006 and October 20, 2011, respectively (collectively, the "Drug Transport Security Agreements").

12)      Certain real property and improvements located at 1519 Perrin Drive, Douglas, Coffee County, Georgia (the "Coffee County Real Estate"), and the rents and profits therefrom, pursuant to, among other documents, a Georgia Security Deed and Security Agreement executed by DB&D in favor of Bank dated June 28, 2006 (as at any time amended or modified, the "Note 10 Security Deed"; together with the Note 1 Security Deed, Note 2 Security Deed, Note 9 Security Deed and Note 11 Security Deed, the "Security Deeds"), recorded on July 13, 2006, at Deed Book 1271, Page 25, in the real estate records of Coffee County, Georgia (the "Coffee County Records").

13)      UCC-1 Financing Statement No. 033-200605663 on August 9, 2006 (the "2006 Financing Statement"), as continued by UCC-1 Financing Statement Amendment No. 033-2011-03931 (the "Continuation Statement"), and that certain UCC-1 Financing Statement No. 044-2012-002324 on July 18, 2012 (the "2012 Financing Statement").

441331

14) That certain Cross-Default and Cross-Collateral Agreement dated July 18, 2012.

15) Substantially all of DTI Logistic's personal property assets (collectively, the "DTI Personal Property"), including, without limitation, accounts, general intangibles, supporting obligations, and the proceeds thereof, pursuant to that certain Security Agreement executed by DTI Logistics in favor of Bank dated July 18, 2012 (the "DTI Security Agreement").

16) Guaranty Agreement executed by DB&D in favor of Bank dated October 21, 2013 (the "DB&D Guaranty"), pursuant to which DB&D guaranteed the full and timely payment and performance of all Obligations owed by Drug Transport to Bank.

17) Guaranty Agreement executed by Drug Transport in favor of Bank dated June 21, 2013 (the "Drug Transport Guaranty"), pursuant to which Drug Transport guaranteed the full and timely payment and performance of all obligations owed by DB&D to Bank.

18) Guaranty Agreement executed by DTI Logistics in favor of Bank dated June 21, 2013 (the "DTI Guaranty"), pursuant to which DTI Logistics guaranteed the full and timely payment and performance of all obligations owed by DB&D to Bank.

D. Additionally, the Bank asserts that Debtors are indebted to the Bank for charges incurred by Drug Transport pursuant to a Commercial Card Agreement (the "Purchasing Card") (balance as of July 16, 2014 - $47,506.61). As of August 1, 2014, that the total principal amount of the indebtedness owed the Bank pursuant to the herein referenced loan documents, the Purchasing Card, and all related documents, instruments and agreements (collectively, the "Pre-Petition Loan Documents"), exclusive of attorney's fees, interests, costs, fees and expenses, was approximately $7,100,949.92 (this amount, together with attorney's fees, interests, costs, fees and expenses, is collectively referred to as the "Pre-Petition Debt").

E. As security for the payment of all Pre-Petition Debt, the Bank asserts that Debtors granted to the Bank security interests in and liens (collectively, the Pre-Petition Liens") upon all or substantially all of such Debtor's real and personal property (all such personal property, as the same existed on or at any time prior to the Petition Date, together with all cash and non-cash proceeds thereof, being hereinafter referred to as the "Pre-Petition Collateral"). Bank asserts that the security interests and liens granted by Debtors to the Bank pursuant to the Pre-Petition Loan Documents are legal, valid, enforceable, duly perfected and first priority security interests in and liens upon the Pre-Petition Collateral.

F. An immediate and ongoing need exists for Debtors to use cash collateral to continue the operations of their businesses as a debtors-in-possession under Chapter 11 of the Bankruptcy Code and to preserve the value of Debtors' assets as a "going concern." Debtors propose to use cash collateral during the Cash Collateral Period (as defined below) in the

4

amounts and for the purposes specified in the budget prepared by Debtors and annexed hereto as Exhibit A (as the same may be amended from time to time with the Bank's prior written consent, the "Budget").

G.      Debtors' counsel has certified that a copy of the Cash Collateral Motion, together with notice of the Interim Hearing, has been served by electronic mail, telecopy transmission, hand delivery, overnight courier or first class United States mail upon the United States Trustee, the Bank, the creditors listed on the list filed with the Court pursuant to Bankruptcy Rule 1007(d) and all creditors known to claim any liens upon any of the Cash Collateral.  Debtors represent that notice of the Cash Collateral Motion, as it relates to this Order, is sufficient for all purposes under the Bankruptcy Code and the Bankruptcy Rules, including, without limitation, Sections 102(1) and 363 of the Bankruptcy Code and Bankruptcy Rule 4001(b).

H.      Good cause has been shown for the entry of this Order and authorization for Debtors to use cash collateral pending the final hearing on the Cash Collateral Motion pursuant to Bankruptcy Rule 4001(b) (the "Final Hearing").  Debtors' need for the use of cash collateral is immediate and critical, and entry of this Order will minimize disruption of Debtors' business and serve to preserve the assets of Debtors' estate and is in the best interest of Debtors, their creditors and their respective estates.

I.      The Debtors have offered as adequate protection the following: (i) liens ("Adequate Protection Liens") to the same extent, validity and priority as they existed pre-petition upon all real and personal property of all Debtors, wherever located and whether created, acquired or arising prior to or after the Petition Date, including, without limitation, all accounts, accounts receivable, inventory, equipment, general intangibles, documents, instruments, chattel paper, deposit accounts, investment property, rents, leases, and contract rights, together with all proceeds of the foregoing items; (ii) as set forth in the Budget, Debtors shall pay to the Bank as adequate protection periodic payments on Note 17; additionally, as set forth in the Budget, Debtors shall pay rent in the amount of $12,700 per month relating to the Tucker Terminal  and $1,300 per month relating to the Douglas Terminal for application against the corresponding real estate notes (i.e. Note 9 and Note 10); and (iii) an administrative priority claim under Section 507(b) of the Bankruptcy Code in the amount, if any, by which the protections afforded herein for Debtors' use or disposition of any of its property (including Cash Collateral) that is subject to the Bank's liens prove to be inadequate.

J.      This Court has jurisdiction to enter this Order pursuant to 28 U.S.C. §§ 157(b) and 1334.  Consideration of the Cash Collateral Motion constitutes a core proceeding, as defined in 28 U.S.C. § 157(b)(2).

**HAVING CONSIDERED THE MATTERS SET FORTH IN THE CASH COLLATERAL MOTION, ALL REPRESENTATIONS OF COUNSEL AT THE INTERIM HEARING, IT IS HEREBY ORDERED, ADJUDGED AND DECREED THAT**:

441331

1.      <u>Disposition of Motion</u>.  The Cash Collateral Motion is hereby GRANTED as hereinafter set forth.

2.      <u>Limited Cash Collateral Use Authorized</u>.  During the Cash Collateral Period (as defined below), Debtors shall be authorized to use Cash Collateral (as defined below) only for Permitted Purposes (as defined below).  As used herein:

(a)      the term "Cash Collateral Period" shall mean the period commencing August _____, 2014, and ending on the sooner to occur of (a) 9:30 a.m. (prevailing Eastern time) on September [____], 2014 (or such later date as the Bank may agree in its sole discretion), or (b) the occurrence of an Event of Default (as defined in paragraph 14 below);

(b)      the term "Cash Collateral" shall mean and include (i) proceeds of Pre-Petition Collateral consisting of pre-petition accounts receivable arising from Debtors' operating prior to the Petition Date in the ordinary course of business or of post-petition accounts receivable arising from the Debtors operating after the Petition Date in the ordinary course of business, (ii) proceeds derived from the post-petition sale in the ordinary course of business of inventory acquired by Debtors after the Petition Date, and (iii) all proceeds derived from the post-petition sale of any other Collateral whether in the ordinary course of business or outside the ordinary course of business, subject to the Court's approval after notice and a hearing; and

(c)      the term "Permitted Purposes" shall mean use by any Debtor of Cash Collateral to pay expenses shown on the Budget and limited to amounts and line items shown on the Budget, <u>provided</u> that the aggregate amount of Cash Collateral used as of any date during the Cash Collateral period may not exceed the aggregate amount of weekly expenses shown on the Budget multiplied by the number of weeks elapsed from the commencement of the Cash Collateral Period through such date by more than ten percent (10%) without written approval of the Bank and <u>provided</u> <u>further</u> that no Cash Collateral may be used to pay any pre-petition claim against any Debtor (other than payroll, payroll related taxes, employee benefits, and critical vendors, if any, approved by the Court after notice and hearing).

3.      <u>Collection of Accounts Receivable</u>.  Each Debtor shall diligently attempt to collect all of its pre-petition and post-petition accounts receivable and all other rights to the payment of money and shall cause all such collections (including all Cash Collateral) to be remitted by its customers and other account obligors.

4.      <u>Limitation on Payments to Affiliated Non-Debtor Entities</u>. Debtors shall not make any payments to any non-Debtor entities owned or operated by any principals of Debtors, family

6

members, or any affiliated entities of such principals except for payments set forth in the Budget that are necessary to pay current amounts due to United Community Bank and Peoples Bank for vehicles leased by Debtors from RSL Leasing, LLC.

5.      Cash Collateral Subject to the Bank's Liens; Bank Under No Obligation to Monitor Use.  Until expended by Debtors, all Cash Collateral shall remain subject to the liens and claims of the Bank under the Pre-Petition Loan Documents and this Order.  In no event shall the Bank be obligated to monitor or otherwise be responsible for Debtors' use of Cash Collateral in conformity with this Order or Debtors' compliance with this Order.  In the event of any material discrepancies between the amounts projected in the Budget for collections, sales or expense item and the actual amounts collected, sold or spent by the Debtors for the same period, the Bank may seek emergency relief from this Court to prevent the further use of Cash Collateral by Debtors hereunder, or such other relief as the Bank may deem appropriate.

6.      Control of Bank Accounts. Debtors shall (i) preserve all cash receipts received by any of them, (ii) open and maintain such accounts as are necessary for the Debtors' compliance with the Bankruptcy Code and the Guidelines of the Office of the U.S. Trustee, (iii) institute appropriate controls to ensure that all disbursement are authorized by the Bankruptcy Code and any cash collateral orders entered in the Chapter 11 Cases, including acting as a signatory on the accounts, and (iv) have exclusive control of the bank accounts to ensure compliance with the duties and responsibilities of the Debtors as debtors in possession.

7.      Termination of Authority to Use Cash Collateral.  After the expiration of the Cash Collateral Period, Debtors shall forthwith cease to use any Cash Collateral except to the extent otherwise allowed by order of the Court after notice and a hearing.  In no event shall the Bank be obligated to monitor or otherwise be responsible for Debtors' use of Cash Collateral in conformity with this Order or Debtors' compliance with this Order.  In the event of any material discrepancies between the amounts projected in the Budget for collections, sales or expense item and the actual amounts collected, sold or spent by the Debtors for the same period, the Bank may seek emergency relief from this Court to prevent the further use of Cash Collateral by Debtors hereunder, or such other relief as the Bank may deem appropriate.

8.      No Authorization for Sales outside the Ordinary Course of Business.  Nothing in this Order shall be deemed to authorize any Debtor to sell or otherwise dispose of any of its pre-petition or post-petition assets other than sales of inventory in the ordinary course of business or to use any cash or other proceeds of any assets of any Debtor except the use of Cash Collateral strictly in conformity with the terms and conditions of this Order.

9.      Reporting.  Debtors shall provide to the Bank a report not later than 4:00 o'clock p.m. (prevailing Eastern Time) on Thursday of each week showing a reconciliation and report of the source of Cash Collateral collected during the immediately preceding week and the disbursements of all Cash Collateral. Upon reasonable notice, one or more representatives of the Bank shall be authorized to visit and remain on the business premises of Debtors at any time or times that Debtors are transacting business to inspect or appraise any assets of Debtors, to audit, inspect or make copies of any of the books and records (including, without limitation, check

7

441331

registers) of Debtors and to obtain supporting details for any of the information provided by Debtors to the Bank hereunder, but such representative shall not interfere with Debtors' business operations. For purposes of this paragraph, all information, reports, documents and notices to be provided by Debtors to the Bank shall be delivered via electronic mail, facsimile transmission or overnight courier of national repute to Branch Banking and Trust Company, Attention: James Richardson, 360 Central Avenue, Suite 1700, St. Petersburg, Florida 33701, facsimile: 727-892-3067, email: Jrichardson@BB&T.com, with a copy to counsel for Parker, Hudson, Rainer & Dobbs LLP, Attention: Joshua J. Lewis, Esq., 1500 Marquis Two Tower,285 Peachtree Center Avenue, NE, Atlanta, 30303.

10.     <u>Adequate Protection Liens Granted to the Bank</u>. As adequate protection for any diminution in the value of Bank's liens and security interests in any property of Debtors (including, without limitation, the Pre-Petition Collateral) resulting from the imposition of the automatic stay or any use, sale, consumption or other disposition of such property (whether pursuant to this or any other order of the Court or the Bankruptcy Code), Bank is hereby granted liens (collectively, the "Adequate Protection Liens") to the same extent, validity and priority as they existed pre-petition upon all real and personal property of each Debtor, wherever located and whether created, acquired or arising prior to, on or after the Petition Date, including, without limitation, all accounts, accounts receivable, inventory, equipment, general intangibles, documents, instruments, chattel paper, deposit accounts, investment property, leases, rents, and contract rights, together with all proceeds of the foregoing items. Notwithstanding the foregoing, the Adequate Protection Liens shall be junior in priority only to (i) the Pre-Petition Liens; and (ii) valid, enforceable, perfected and nonavoidable liens and security interests granted by Debtors in favor of parties other than Bank upon any Debtor's equipment, <u>provided</u> that such security interests and liens (x) existed on the Petition Date and (y) were senior in priority to as of the Petition Date, after giving effect to any existing subordination or intercreditor arrangements, to the Pre-Petition Liens. The Adequate Protection Liens and all claims, rights, interests, administrative claims and other protections granted to or for the benefit of Bank pursuant to this Order and the Bankruptcy Code shall be deemed automatically valid, enforceable, perfected and nonavoidable upon entry of this Order without the necessity of the execution by any Debtor or the filing or recording of any account control agreement, financing statement, mortgage, assignment, trust deed or other notice or document of any kind. The Adequate Protection Liens shall not extend to the proceeds of any avoidance actions received by Debtors or the estate pursuant to Sections 544, 547, 548, 549 or 550 of the Bankruptcy Code ("Avoidance Actions"). Notwithstanding anything herein to the contrary, the liens granted to the Bank hereunder in connection with the use of Collateral and cash collateral shall be subject and junior to the fees of the Office of the United States Trustee pursuant to 28 U.S.C. §1930.

11.     <u>Periodic Payments</u>. As set forth in the Budget, Debtors shall pay to the Bank as adequate protection periodic payments on Note 17. Additionally, as set forth in the Budget Debtors shall pay rent in the amount of $12,700 per month relating to the Tucker Terminal and $1,300 per month relating to the Douglas Terminal for application against the corresponding rela estate notes (i.e. Note 9 and Note 10).

8

12.     <u>Superpriority Claim</u>.  The Bank shall be entitled to seek an administrative priority claim under Section 507(b) of the Bankruptcy Code in the amount, if any, by which the protections afforded herein for Debtors' use or disposition of any of its property (including Cash Collateral) that is subject to the Bank's liens prove to be inadequate.

13.     <u>Reservation of Rights</u>.  Nothing contained in this Order shall be deemed to constitute a finding with respect to the adequacy of the protection of the interests of the Bank in the Pre-Petition Collateral or a waiver by the Bank of its right to seek other or additional relief from the Court, including, without limitation, the right to seek additional protection, to move for relief from the automatic stay, to seek a dismissal or conversion of this Chapter 11 case or to seek the appointment of a trustee or examiner.

14.     <u>Events of Default</u>.  The occurrence or existence of any one or more of the following events or conditions shall constitute an "Event of Default": (i) the conversion or dismissal of any of these Chapter 11 Cases; (ii) the appointment of a trustee or an examiner with expanded powers in any of these Chapter 11 Cases; (iii) any Debtor's failure to maintain adequate insurance to the extent as existed on the Petition Date; (iv) any Debtor's failure duly and punctually to perform any of its obligations under this Order; (v) if this Order is amended, vacated, stayed, reversed or otherwise modified without the prior written consent of the Bank; (vi) if Debtors fail to pay the monthly payments required as set forth in paragraph 10 above; (vii) if the Court shall enter an order granting to any person or entity other than the Bank relief from the automatic stay to foreclose upon any lien or security interest with respect to any of the Pre-Petition Collateral; (viii) if Bayard B. Hollingsworth, as designee of Triton Capital Partners, Ltd., shall  fail to maintain exclusive control over Debtors' bank accounts; or (ix) without the prior written consent of the Bank, the entry of an order authorizing any Debtor to use any Cash Collateral on terms other than as set forth in this Order or to obtain any financing under Section 364(d) of the Bankruptcy Code secured by a priming lien or lien of equal priority with the Adequate Protection Liens or the Bank's liens upon any of the Pre-Petition Collateral.

15.     <u>Remedies upon Event of Default</u>.  Upon the occurrence of an Event of Default, the Bank or the Bank's counsel may file under this Court's CM/ECF filing system an affidavit of default specifying such Event of Default.  If Debtors dispute that an Event of Default has in fact occurred, Debtors may file a contravening affidavit within 5 calendar days of the date of filing of the affidavit of default. If no such contravening affidavit is timely filed, the Debtors shall forthwith cease any further use of Cash Collateral and the Court may enter an order prohibiting further use of Cash Collateral (but Debtors shall be prohibited from further use whether or not such an order is entered).  If Debtors timely file a contravening affidavit, the Court shall set an expedited hearing, <u>provided</u> that the only issue at such hearing that may be raised by the Debtors shall be whether, in fact, an Event of Default has occurred and is continuing.

16.     <u>Other Obligations of Debtors Under Loan Documents Remain in Effect</u>.  Debtors are authorized and directed to comply with all provisions contained in any of the Pre-Petition Loan Documents relating to the maintenance and continuation in effect of any insurance policies, whether property, casualty, liability, credit or otherwise, provided that Debtors shall only be

441331

authorized to pay insurance premiums during the Cash Collateral Period in such amounts and at such times as are necessary to prevent imminent lapse or cancellation of a policy or policies.

17.    <u>No Consent to Surcharge</u>.  Neither this Order nor the Bank's consent to the Budget or the use of Cash Collateral as herein provided shall constitute a consent provided by the Bank to any surcharge under Section 506(c) of the Bankruptcy Code.

18.    <u>Survival of Provisions of This Order</u>.  The provisions of this Order and any action taken pursuant to the terms hereof shall survive the entry of any order that may be entered dismissing any of these Chapter 11 Cases or converting any of these Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code, and all of the terms and conditions of this Order as well as the liens and security interests granted pursuant hereto shall continue in this or in any superseding case under the Bankruptcy Code, and such liens and security interests shall retain their priorities provided by this Order until satisfied and discharged.

19.    <u>Notice of Final Hearing</u>.  Promptly after the entry of this Order, within the time specified by local rules, Debtors shall serve a copy of this Order to the U.S. Trustee, the Bank, the parties included on the Debtors' consolidated list of thirty (30) largest unsecured creditors, any creditors who have heretofore filed a request with the Court for notices, and each secured creditor and shall file a certificate of service regarding same with the clerk of the Court.  The Final Hearing shall be held at _____ **a.m., on** _____, **2014**, **at Courtroom _____, United States Bankruptcy Court, 75 Spring Street, SW, Atlanta, GA 30303**. If at or after the Final Hearing the Court modifies any of the provisions of this Order, then such modifications shall not affect the rights and remedies granted to the Bank pursuant to this Order, all of which rights and remedies shall remain in full force and effect with respect to Cash Collateral used by the Debtors prior to the effective date of such modifications.

**END OF DOCUMENT**

**Prepared and Presented by:**

LAMBERTH, CIFELLI, STOKES,
 ELLIS & NASON, P.A.


  _/s/ Gregory D. Ellis_____
James C. Cifelli
Georgia Bar No. 125750
jcifelli@lcsenlaw.com
Gregory D. Ellis
Georgia Bar No. 245310
gellis@lcsenlaw.com

10

William D. Matthews
Georgia Bar No. 470865
wmatthews@lcsenlaw.com
3343 Peachtree Road, N.E., Ste. 550
Atlanta, Georgia  30326
T: (404) 262-7373 | F: (404) 262-9911

**Identification of parties to be served:**

James C. Cifelli, Lamberth, Cifelli, Stokes, Ellis & Nason, P.A., 3343 Peachtree Road NE, Suite 550, Atlanta, GA 30326

Gregory D. Ellis, Lamberth, Cifelli, Stokes, Ellis & Nason, P.A., 3343 Peachtree Road NE, Suite 550, Atlanta, GA 30326

William D. Matthews, Lamberth, Cifelli, Stokes, Ellis & Nason, P.A., 3343 Peachtree Road NE, Suite 550, Atlanta, GA 30326

Office of the United States Trustee, 362 Richard Russell Building, 75 Spring Street, S.W., Atlanta, GA  30303

441331

**<u>Exhibit A</u>**

**(Budget)**

441331

## CERTIFICATE OF SERVICE

This is to certify that I have this day served a true and correct copy of the foregoing

document upon all those parties listed below by depositing same in the U. S. mail in a properly

addressed envelope with adequate postage affixed thereon to assure delivery to:

> Office of U.S. Trustee
> 365 Richard Russell Bldg.
> 75 Spring Street, S.W.
> Atlanta, GA  30303
> guy.gebhardt@usdoj.gov
> ustp.regon21@usdoj.gov
>
> James S. Rankin, Jr.
> Joshua J. Lewis
> Parker, Hudson, Rainer & Dobbs, LLP
> 1500 Marquis Two Tower
> 285 Peachtree Center Avenue
> Atlanta, GA  30303
> jsr@phrd.com
> jjl@phrd.com

This 11th  day of August, 2014.

> /s/ Gregory D. Ellis_____
> Gregory D. Ellis
> Georgia Bar No. 245310

440726